554 A.2d 444

**Eugene R. BRICKER**

v.

**Mary A. BRICKER.**

**No. 1051, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

March 8, 1989.

John H. McDowell, Hagerstown, for appellant.

Kenneth J. Mackley (Mackley, Gilbert & Marks, on the brief), Hagerstown, for appellee.

Argued before BLOOM, ROSALYN B. BELL and KARWACKI, JJ.

ROSALYN B. BELL, Judge.

We are asked to decide whether a trial judge of the Circuit Court for Washington County erred in awarding indefinite alimony and in addition ordering the economically independent spouse to reimburse the other for future medical insurance premiums. While we conclude the trial judge did not err in awarding indefinite alimony, we hold he did err in ordering reimbursement for future medical insurance premiums.

## INDEFINITE ALIMONY

Before reaching the first issue presented, we will look briefly at alimony from a historical perspective. Until 1980, the only alimony the courts in Maryland could award was technical alimony. Moreover, technical alimony could only be awarded by the court.

Technical alimony was specifically defined by Judge Powers in *Simpson v. Simpson*, 18 Md.App. 626, 628–29, 308 A.2d 410 (1973), as follows:

"Alimony is a money allowance payable under a ju[d]icial decree by a husband at stated intervals to his wife, or former wife, during their joint lives or until the remarriage of the wife, so long as they live separately, for her support and maintenance.

"a. It must terminate on the remarriage of the wife.

"b. It must terminate on the death of the wife.

"c. It must terminate on the death of the husband."

(Footnote omitted.)

For completeness, we would add that the award was modifiable by the court. While we must substitute "economically dependent spouse" for the term "wife" and "economically independent spouse" for the term "husband," *see Hofmann v. Hofmann,* 50 Md.App. 240, 244, 437 A.2d 247 (1981), Md.Fam.Law Code Ann. § 11–101 (1984), this definition of technical alimony is essentially the same as what is now designated as indefinite alimony.[1]

In 1980 there was a major revision in the law relating to alimony. That change was much more than merely giving a new name to an old concept. In 1976, Marvin Mandel, then Governor of Maryland, had established a Commission on Domestic Relations Laws "to undertake a complete study of the constitutional, statutory, and common law concerning domestic relations, including the laws concerning marriage, the dissolution of marriage, the rights and obligations attendant upon or accruing from each, and the procedures for resolving and adjudicating domestic disputes."[2] The first report of the Commission was the impetus for sweeping legislative changes in property rights in the event of divorce in Maryland. The second report of the Commission dealt with alimony. In its Report, the Commission referred specifically to the term of alimony awards:

"a. The award of alimony in the ordinary case should be for a specific time, and that time should be stated in the Order or Decree making the award. Preferably, that time should be fixed in relation to a specified program or goal on the part of the recipient party that will lead to self-sufficiency before that time.

---

**1.** For further discussion on technical alimony, *see Mendelson v. Mendelson,* 75 Md.App. 486, 541 A.2d 1331 (1988).

**2.** The Governor's Commission on Domestic Relations Laws, *Report to the Governor of Maryland,* 1 (1978).

"b. The Court should have the power to extend that time, under certain circumstances, to avoid a harsh and inequitable result."

On the issue of self-sufficiency, the Commission asserted:

"The Commission believes that the proper solution is neither to forbid nor to require either equality or discrepancy with respect to the standard of living of the parties after a divorce. Our proposal does not require the Court to make the two standards the same. It does empower the Court, however, in cases where the standard of living of the recipient party would be *unconscionably* disparate from that of the paying party, to provide for an extended or indefinite period of payment. This allows the matter of relative standards of living to be resolved, as it seems to us it must be, on a case-by-case basis."[3]

The general principles dealing with alimony are now a part of Md.Fam.Law Code Ann. §§ 11–101 to 11–111 (1984). The authority for indefinite alimony appears in § 11–106(c):

**"Award for indefinite period.**—The court may award alimony for an indefinite period, if the court finds that:

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate."

In the instant case, the trial judge concluded that both these situations applied, opining:

"The Court finds that the husband is wholly self-supporting, but the wife is only partly self-supporting. In view of her age, the present state of her health and her lack of significant work experience outside of the home, the Court finds that it cannot reasonably be expected that

---

**3.** The Governor's Commission on Domestic Relations Laws, *Report to the Governor of Maryland* at 4–5 (1980).

the wife will make substantial progress towards becoming self-supporting. Even though she has been working between 55 and 60 hours per week, she is only partly self-supporting. In order to earn her present income, she is working between 55 and 60 hours. It is unrealistic to expect she will continue to work such long hours in a physically demanding job, considering her age and the present state of her health.

"In addition, the Court further finds that the wife has made as much progress towards becoming self-supporting as can reasonably be expected. I find that the respective standard of living of the two parties remains unconscionably disparate. Therefore, the Court is going to award alimony for an indefinite period, in the amount of $60.00 per week, plus a continuation of group medical insurance through the husband's employer, Mack Trucks, Inc."

The judgment conformed to the court's opinion. Appellant filed a timely motion to alter or amend this judgment. The motion was granted in part in that the award for medical insurance was amended. More details in connection with this issue will appear later.

Appellant does not dispute the facts as found by the trial judge. He takes a different tack. He points out that the wife produced no expert testimony or evidence on her inability to secure employment that would be more economically advantageous. He asserts that, absent that evidence, the trial judge of necessity was speculating in making the award.

 Expert testimony on an issue is necessary if the trier of fact cannot reasonably infer the ultimate conclusion without favorable expert testimony. *Schweitzer v. Showell*, 19 Md.App. 537, 543, 313 A.2d 97 (1974) (relationship between knee injury and spinal disc involvement). A trial judge can determine without expert testimony whether a person can reasonably expect to achieve self-sufficiency or if the incomes of two persons will be grossly disparate.

These concepts are not foreign to most persons and are within the ability of a fact finder to deduce. That is not to say that it is inappropriate to have an expert in a situation such as this. Evidence of the degree to which an economically dependent spouse can or cannot reach self-sufficiency could not only be helpful, it could be preferable. The issue here, however, is whether the evidence presented was sufficient to support the conclusion reached by the trial judge. To make that determination, we look at the evidence before the trial judge.

■ The parties had been married for about 25 years. Two children, who have reached their majority, were born to the parties. When she became pregnant, the wife left her job. Except for the first two or three years of the marriage and again after the parties separated in 1981, the wife did not work outside the home. The decision that she remain a full-time homemaker during the marriage was a mutual one. Both parties were high school graduates. The wife was 50, the husband 46. The court specifically found:

"After the parties separated, the wife went to work for Dunkin–Donuts for approximately two years and then went to work at Jeanne's Confectionery in Williamsport. She works six days a week, between 55 and 60 hours per week. Recently, on a temporary basis, she has worked as much as 70 to 72 hours per week. She is paid $3.35 per hour, plus tips which are pooled together and divided once a month."

And

"The wife suffers from an asthmatic condition. She takes medication year-round. When she experiences an 'attack', it becomes difficult for her to breathe and she needs the care of a doctor. She has not been hospitalized in the last year and a half, and her condition has been under control for the past year or so.

"The wife testified her husband is in good condition for his age. He testified he has health problems: high blood pressure (160/118), irregular heart beat and chronic pulled muscle in his back. Neither spouse has been

unable to work regularly because of health problems. The wife's job is very physically demanding, particularly in view of the unusually long hours."

He further found:

"The wife's gross monthly income is $788.79; his, $2242.02. Her net income is $638.82; his, $1503.35. Their principal asset, as listed in their net worth statements, is the one-half interest in the proceeds from the sale of the marital home."

Based on these facts alone, the trial judge could have concluded, as he ultimately did, that she had not become self-supporting during six or seven years of separation due to her age and illness and she could not reasonably be expected to become self-supporting.

The trial judge also knew the gross income of appellant was $2,242 per month; that of appellee was $788.79. Maximizing her income while working excessive hours, appellee's income was only 35 percent of that of appellant. In *Kennedy v. Kennedy*, 55 Md.App. 299, 307, 462 A.2d 1208 (1983), we held that the chancellor did not abuse her discretion in granting a wife indefinite alimony where her gross income was 34 percent of her husband's. Moreover, in *Kennedy*, we did not have the exacerbating condition that we have here; namely, that due to appellee's health, she might not be able to continue the demanding hours of physical labor she was presently performing.

Whether appellee could ever become self-supporting and whether the parties' income would still be unconscionably disparate after she had made all the progress toward becoming self-supporting may be referred to as second-level facts or conclusions of law. As we noted earlier, the first-level facts are not disputed. The conclusions that are drawn therefrom are not clearly erroneous, we must affirm. Rule 8–131(c).

## MEDICAL INSURANCE

The parties had been granted a limited divorce on December 19, 1985. In that decree, appellee was awarded alimony

and appellant was required to pay the mortgage installment on the family home.[4] Then on October 17, 1987, an absolute divorce was granted, reserving alimony, monetary award and a contribution toward legal fees and expenses.

As earlier mentioned, the order of December 21, 1987 which ordered alimony also provided for health insurance coverage. It specified that appellant "pay for medical insurance coverage for [appellee] through the group insurance plan in force at his place of employment, Mack Trucks, Inc." This was later amended to specify that appellant pay appellee "within fifteen (15) days after she submits to him an invoice therefor such amount as represents the quarterly premium on a Blue Cross/Blue Shield health insurance policy with a $500 deductible." The order explained that this provision was in lieu of the group insurance coverage of the December 21, 1987 order.

Appellant makes two arguments in pursuit of a reversal: (1) that appellee neither filed a petition to modify the alimony nor produced evidence of a change of circumstances as a prerequisite to modification; and (2) that, except under limited exceptions not here present, neither the common law nor any statute provides for payment of medical insurance premiums for surviving spouses. Hence, appellant argues that the court had no power to order reimbursement coverage of medical insurance over and above the alimony award.

### Modification

The failure of appellee to petition the court for modification of the judgment is not controlling. Appellant sought to alter or amend the judgment based on the unavailability of insurance coverage to appellee under the group health policy provided by Mack Truck. The trial judge concluded appellant was correct; based on the unavailability of that

---

**4.** The award was made despite the fact that no minor children were then in the home. No appeal was taken from that order.

benefit for appellee, he reconsidered the provisions he had made in the decree.

A timely filed motion to alter or amend a judgment under Rule 2–534 stays the time for noting an appeal. In accordance with that Rule, the court may "open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision ... [or] may amend the judgment...." The trial judge did just that.

 When a judgment in a domestic case is reversed by an appellate court because of an error in establishing a monetary award, on remand the trial court must reconsider the alimony awarded based on the interdependence of the two awards. *Campolattaro v. Campolattaro,* 66 Md.App. 68, 75, 502 A.2d 1068 (1986). The judgment is a package, so when a judgment in a domestic case is amended following a motion to alter or amend, the trial court must reconsider those other portions of the award which are affected. If a change is made that affects the amounts awarded, a reconsideration of the remaining segments is required. Once the trial judge concluded that he could not order appellant to provide and pay for coverage under appellant's group insurance for reasons we will later discuss, he needed to consider the effect of this conclusion on the alimony awarded. In awarding alimony, one of the factors to be considered is "the financial needs and financial resources of each party...." § 11–106(b)(11). The trial judge had reason to be concerned that appellee had no access to a group plan and that she did not have the resources to pay for medical coverage. He also had reason to be concerned about appellee's possible preexisting condition, namely, the asthma. He could not order appellant to continue medical insurance under the Mack Truck policy and was compelled by the situation to alter the method of providing coverage. Here, appellant sought the alteration or amendment of the judgment. The trial judge did amend, albeit not quite as appellant hoped. That Appellee did not seek modification is irrelevant. The change in circumstances necessary for

modification is provided by the loss of insurance coverage through appellant's employer.

### Authority of the Court to Order Payment of Medical Insurance in Addition to Stated Alimony

█ Appellant's second argument is more complex and requires an examination of alimony under the common law prior to the 1980 alimony statute and the current relevant statutes. We will examine whether the trial court is permitted to award reimbursement of medical insurance premiums over and above an award of alimony either under the common law or under the statute now authorizing alimony. Since we conclude the court may not do so, we will then look to other specific statutes which might prove applicable.

### —Alimony: Common Law and Statutory—

The trial judge ordered appellant to reimburse appellee for the cost of an individual health insurance policy. Appellant contends that, in the absence of an agreement between the parties, the court may award only periodic monthly payments of a fixed amount and has no power in the absence of a statute to require one spouse to reimburse the other for his or her expenses.

### —Common Law—

At common law, alimony in the form of a money allowance was all that could be awarded by the court. *Simpson,* 18 Md.App. at 628, 308 A.2d 410; the amount had to be established based on the circumstances as of the date of the award, *Benner v. Benner,* 37 Md.App. 367, 370, 377 A.2d 582 (1977); and the money allowance could not be subject to automatic adjustment, *Young v. Young,* 61 Md.App. 103, 112, 484 A.2d 1054 (1984). Hence, the money allowance was of necessity a fixed amount.

At common law, the court may not require one spouse to satisfy joint obligations of the parties such as mortgages and taxes on real property, *Schuman v. Schuman,* 252 Md. 13, 15, 248 A.2d 876 (1969), or pay the interest on joint

promissory notes, *Roberts v. Roberts,* 160 Md. 513, 523, 154 A. 95 (1931). While it is inappropriate to require one spouse to pay the joint obligations of the other, it is even less appropriate to require one spouse to pay the sole obligation of the other.

In *Roberts,* 160 Md. at 521–22, 154 A. 95, the Court of Appeals stated:

> "[N]o allowance to the wife in actions for divorce or separation will be treated as alimony which does anything more than provide for the payment of money at stated periods to the wife for her support during the joint lives of the parties so long as they are separated, and that principle applies with equal force to this decree."

The Court of Appeals acknowledged that this principle was not universally accepted but, as of that date (1931), had been the law of this State for 150 years. The *Roberts* Court held that, to the extent the decree required the husband to pay "dues, charges, taxes, etc., on the common property," and the "interest on a promissory note executed jointly by" the parties, the order was invalid as it was not supported by an agreement. *Roberts,* 160 Md. at 522, 523, 154 A. 95. The fixed amount could not be augmented by an add-on amount. The common law provides no support for the award made here.

### —Alimony Statute—

The principle set out in *Roberts* remained the firm position surrounding the award of alimony for almost 50 more years. Then in 1979, the first exception splashed into the settled waters which long required one fixed amount. This was quickly followed by 1980 Md.Laws, ch. 575, (the Alimony Act) now codified in Title 11 of Md.Fam.Law Code Ann. which made alimony statutory.[5]

---

5. We express no opinion on the appropriateness of a plan encompassing a progressively larger sum to provide for an economically dependent spouse while he or she is securing retraining or a progressively smaller amount of alimony for an economically dependent spouse

The 1979 exception to the rule that only payment of one fixed sum in stated intervals was appropriate, was enacted in connection with the award of a use and possession order of the family home and family use personal property. Under Md.Fam.Law Code Ann. § 8–208(c) (1984), the court may allocate the financial responsibilities for that property to either spouse over and above alimony and child support:

"The court may order or decree that either or both of the parties pay all or any part of:

(1) any mortgage payments or rent;

(2) any indebtedness that is related to the property;

(3) the cost of maintenance, insurance, assessments, and taxes; or

(4) any similar expenses in connection with the property."

While the payment of property expenses is not identical to reimbursement, it does amount to the payment of expenses of one spouse by the other and does supersede the holding in *Schuman* and in *Roberts* to the extent that it authorizes an order providing for the payment of these delineated expenses. It does, however, leave intact the balance of the *Roberts* holding as it relates to expenses other than those delineated. Furthermore, except for those limited exceptions, it does not alter the necessity of one fixed sum for alimony itself. No provision was made in § 8–208 governing use and possession or the Alimony Act authorizing any other supplemental award. Hence, support for the award for medical coverage cannot be found there. We look next to Md.Code Ann. Art. 48, § 490H (1957, 1986 Rep.Vol., 1988 Cum.Supp.).

## —Article 48A, § 490H—

The cost of medical care has skyrocketed in recent years. The problems attendant to preexisting conditions, the expense of individual policies, and the particular need for

---

while she or he is ascending toward self-sufficiency. This issue is simply not before us.

continued coverage under group plans for involuntarily terminated employees, surviving spouses, dependent children and divorced spouses have become matters of major public importance. In response to these issues, the 1986 General Assembly of Maryland passed § 490G, H and I of Article 48A.[6] Of significance to us is § 490H, which requires medical coverage in group contracts be made available for dependent children and a divorced spouse who have been covered for at least the 30–day period preceding the divorce. The Act designates these children and spouses as qualified secondary beneficiaries. It provides for payment for the coverage of these qualified secondary beneficiaries through payroll deductions of the insured.[7]

The Act further provides in subsection (h) for the allocation of the additional costs incurred. Those costs

"may be allocated between the insured and a qualified secondary beneficiary by reason of having been the insured's spouse or may be reimbursed in full to the insured by such qualified secondary beneficiary by agreement between the parties or, as equity may require, by order of the court under Title 10, Title 11, or Title 12 of the Family Law Article at the time of the applicable change in status or thereafter."

For benefits to flow to these qualified secondary beneficiaries under Art. 48, § 490H, the employee spouse must be

---

**6.** Article 48A, § 490H replaced Art. 48A, § 477K, which was enacted in 1976. Section 477K also provided for benefits for a divorced spouse. Section 490H, however, substantially enhanced those benefits. In order to ease the impact of those enhanced benefits, the effective date for § 490H was postponed to January 1, 1987.

**7.** The Act provides in pertinent part:
"(e) *Payroll deductions for qualified secondary beneficiaries.—* From the date of the applicable change in status until the date on which the termination statement is received by the employer, the insured shall pay to the employer, through payroll deduction or otherwise as may be determined by the employer, the sum of the employer's contribution for a qualified secondary beneficiary as defined in subsection (a)(6)(i) of this section and the amount of contribution which would have been paid by the insured if there had been no applicable change in status."

covered by a group contract. Unfortunately, a pertinent provision of the Act excludes appellee from coverage. Article 48A, § 490H applies only to group contracts; a group contract is defined as:

> "(i) Any insurance contract or policy issued or delivered in this State to the employer of the insured by a nonprofit health service insurance plan or an insurance company which provides group hospital, medical, or surgical benefits to the insured on an expense-incurred basis; or

> "(ii) Any contract between the employer of the insured and a health maintenance organization certified under Title 19, Subtitle 7 of the Health–General Article which provides group hospital, medical, or surgical benefits offered to the insured."

Art. 48A, § 490H(a)(4).

In the instant case, appellant contends and appellee did not dispute that Mack Truck is self-insured and that the plan is self-administered. Since Mack Truck is a Pennsylvania corporation, it does not fall under subsection (a)(4)(i) in that the contract was issued in Pennsylvania and delivered in Pennsylvania. Nor is there an allegation that Mack Truck is or operates a health maintenance organization certified under Title 19, Subtitle 7 as provided in subsection (a)(4)(ii). While Art. 48A, § 490H(h) expressly authorizes a court to order an insured to pay for medical coverage for a qualified secondary beneficiary, that option was not available in the instant case as the contract is not a group contract as defined in the Act.[8] Hence, we must look elsewhere for authority to include supplemental payment for medical coverage. We look then to the federal law to see what, if any, authority is present there.

---

8. We note that the benefits specified under § 490H are available to the spouse of the employee so long as he or she is a qualified secondary beneficiary. It matters not whether any alimony is awarded or to whom it is awarded.

Unlike the Maryland law dealing with continued coverage of medical plans, which focuses directly on regulation of the contents of the insurance contract, the applicable federal law focuses on the deductibility of the premiums to encourage employers to provide for continued coverage. To achieve what it deemed a legitimate social policy, Congress enacted the Comprehensive Omnibus Budget Reconciliation Act (COBRA) of 1986, Pub.L. No. 99–272, 100 Stat. 82 (1986). Title X, § 10001 of the Act amended, *inter alia,* § 162 of the Internal Revenue Code of 1954 and provided that no trade or business deduction would be permitted for expenses of group health plans unless the plan incorporated a number of required provisions. It specifies that a group health plan cost is deductible "only if each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled to elect, within the election period, continuation coverage under the plan." 26 U.S.C. § 162(k)(1) (1988). "The divorce or legal separation of the covered employee from the employee's spouse[,]" 26 U.S.C. § 162(k)(3)(C), is one of the qualifying events which triggers the right to continued coverage for one "who, on the day before the qualifying event for that employee, is a beneficiary under the plan ... as the spouse of the covered employee." 26 U.S.C. § 162(k)(7)(B)(i)(I). The election period begins on the date of the qualifying event and must last for at least 60 days. 26 U.S.C. § 162(k)(5)(A)(i) & (ii). The coverage continues for 18 to 36 months following the qualifying event, depending upon the nature of the event. 26 U.S.C. § 162(k)(2)(B)(i)(I)–(IV).[9]

Pub.L. No. 99–272, Sec. 10001(e) dealt with effective dates and in pertinent part provides:

"(2) Special Rule for Collective Bargaining Agreements.—In the case of a group health plan maintained

---

9. On the other hand, the benefits under § 490H are not limited to a specified time period but may be terminated by the events set forth in (C) of that section.

pursuant to one or more collective bargaining agreements between employee representatives and one or more employers ratified before the date of the enactment of this Act, the amendments made by this section shall not apply to plan years beginning before the later of—

"(A) the date on which the last of the collective bargaining agreements relating to the plan terminates (determined without regard to any extension thereof agreed to after the date of the enactment of this Act), or

"(B) January 1, 1987.

For purposes of subparagraph (A), any plan amendment made pursuant to a collective bargaining agreement relating to the plan which amends the plan solely to conform to any requirement added by this section shall not be treated as a termination of such collective bargaining agreement."

At the hearing to alter or amend the judgment, the parties stipulated to the facts contained in a letter from Mack Truck Inc. to counsel for appellant. In that letter, J.C. Killino, Benefits Administration Manager, stated that appellant is a member of the United Automobile Workers Union (UAW); that his health benefits coverage is provided under a collective bargaining agreement between Mack Truck and the UAW. When COBRA was passed, such a collective bargaining agreement was in effect. Mr. Killino concluded:

"The collective bargaining agreement under which Mr. Bricker was covered was renegotiated and renewed in May 1987. Therefore, in accordance with the federal regulations, COBRA became effective for the UAW bargaining employees of Mack [Truck] beginning with the first day of the first plan year following May 1987 which was January 1, 1988."[10]

---

10. Arguably, the conclusion does not necessarily follow. COBRA was approved April 7, 1987. Unless the renewal of May 1987 was ratified before the enactment, it would appear that the collective bargaining agreement terminated in May of 1987. On the other hand, it is

We note that the COBRA provisions, while of significant potential benefit to spouses of insureds, contains no provision to allocate costs between the parties, but places any burden to elect and to arrange payment upon the beneficiary. As such it gives no semblance of authority to the court to order an insured to make the payments for the coverage. Neither the State nor the Federal legislation is of benefit to appellee.

—Analogous Statutory Provisions—

The Legislature of Maryland did in one instance provide for medical coverage in connection with child support. Child support payments may be augmented by medical coverage. Only, however, if "the parent is covered by a health insurance policy; and ... the child can be included on the policy at a reasonable cost to the parent" is this authorized. Md.Fam.Law Code Ann. § 12–102 (1984). Neither § 12–102 nor Art. 48A, § 490H requires payment for individual coverage in addition to alimony or child support.

In making these medical coverage provisions, one theme is apparent. The Legislature preserved for a divorced spouse and children under § 490H and children under § 12–102 the benefits of a policy that was in place. This serves two purposes. It avoids the risk of a defense of preexisting conditions and continues coverage at lower rates. If these are the purposes of these two statutes, these purposes are not served by a new contract. Since § 490H and § 12–102 are relatively recent additions to the law, the Legislature easily could have increased the provisions for medical coverage for spouses and children to go

---

possible that the plan did not terminate in May of 1987 and the amendments were merely to conform to this Act. In that case, even if not a termination, then benefits might have been available. The Act, however, defines qualifying event to include "[t]he divorce or legal separation of the covered employee from the employee's spouse." 26 U.S.C. § 162(k)(3)(C). No election was made and the parties received a limited divorce over 36 months ago. Hence, the required coverage, if any, would have terminated.

beyond plans in place. The Legislature did not do so. We cannot.

The trial judge did in fact err; his intention, however, was beneficent. He apparently concluded appellee needed insurance coverage as a part of her maintenance. We conclude that justice will best be served by permitting further proceedings in accordance with Rule 8-605(d). We remand for the trial judge to determine, in the light of our holding, whether the amount of alimony to be awarded should be amended.[11] The trial judge must determine an amount of alimony which includes such sum as he concludes is appropriate with due regard to all the factors set forth in § 11-106.[12] In the exercise of our discretion, we are assessing the costs against appellant.

---

**11.** We cannot help but note that both parties and particularly appellant might well fare better with a flexible add-on award than with a fixed amount. A series of return visits to the courthouse for modification as the amount goes up or down is rarely cost effective.

**12.** § 11-106(b) of the Maryland Family Law Code Annotated, provides that the court shall consider the following factors in making the determination of the amount of and the period for an award of alimony:

"(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties; and

(11) the financial needs and financial resources of each party, including:

(i) all income and assets, including property that does not produce income;

JUDGMENT AFFIRMED IN PART AND REMANDED IN PART WITHOUT AFFIRMANCE AND WITHOUT REVERSAL FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

COSTS TO BE PAID BY APPELLANT.

(ii) any award made under §§ 8–205 and 8–208 of this article;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits."